Joseph BENEVENTO, Drew W. Krapf, Esther Rosenblum, Bruce C. Compaine, Edward Maze and Rita Baskin, Plaintiffs for themselves and all other similarlysituated annuity purchasers,

v.

LIFE USA HOLDING, INC., Defendant.

No. CIV. A. 97–CV–7827.

United States District Court, E.D. Pennsylvania.

Sept. 29, 1999.

John M. Elliott, Thomas J. Elliott, Timothy T. Myers, Mark A. Kearney, Brian J. McCormick, Jr., Elliott, Reihner, Siedzikowski & Egan, P.C., Blue Bell, PA, for Plaintiffs.

William T. Hangley, Daniel Segal, Hangley, Aronchick, Segal & Pudlin, Philadelphia, PA, James F. Jorden, Waldemar J. Pflepsen, Jr., Paul A. Fischer, Richard Karpinski, Jorden, Burt, Boros, Chicchetti, Berenson & Johnson, LLP, Washington, DC, for Defendant.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

This case is now before the Court upon motion of the defendant, LifeUSA Holding, Inc. for the entry of summary judgment in its favor as to all counts of the plaintiffs' complaint. For the reasons which follow, the motion is denied.

### *History of the Case*

This case, which was instituted in December 1997, arose out of the plaintiffs'

purchase of "Accumulator"[1] annuity products from defendant LifeUSA Holding, Inc. and its subsidiaries and divisions.[2] Essentially, it is the plaintiffs' contention that the manner in which the defendant marketed, promoted and sold the accumulator annuities to them was fraudulent in that they were not properly apprised of, *inter alia*, the terms and conditions governing the manner in which their funds would earn interest, how they could withdraw their funds, what would happen in the event of withdrawal, or the annuities' true interest rates and yields. According to the plaintiffs, "LifeUSA created and implemented a purposeful scheme to deceive and mislead them and the class of LifeUSA annuity purchasers through:

(a) inducing agents to sell LifeUSA annuities, as opposed to other annuity policies, with representations of the highest commissions, equity ownership in LifeUSA, producer perks and wire transfer of commissions within twenty-four hours of obtaining the purchaser's funds and before the purchasers received their LifeUSA "fine print" contract;

(b) training agents through standardized and uniform misrepresentations and nondisclosures that, *inter alia*, the agents' clients, through LifeUSA, would be paid substantial interest bonuses, "current" interest rates, and obtain "fully insured" and "safe" economic gain greater than the gains offered in the stock market or Certificates of Deposit;

(c) concealing and failing to disclose the true terms of the LifeUSA Accumulator annuity from the purchasers, who are given no written materials from LifeUSA and provided with only an application and the uniform representations of LifeUSA agents based upon LifeUSA's standardized misrepresentations and material omissions taught to the agents;

(d) immediately rewarding the agents with "producer perks" within 24 hours of sale and then later sending fine print annuity contracts which are misleading and ambiguous;

(e) disguising the interest rates paid to LifeUSA purchasers in quarterly accountings by comparing the Accumulator annuity favorably with Bank Certificates of Deposit and then misrepresenting the "yield" as the "interest rate," thus purposefully creating a false impression that the represented "compounded daily" interest rate is much higher, when in fact, the interest rate is less than the represented "interest rate" and then,

(f) eliminating any ability for the purchaser to gain the misrepresented benefits of their annuity policy upon withdrawal because when a purchaser attempts to obtain the benefits they must accept ... a lump sum of principal and interest with a "penalty" ... of approximately 5% ...., periodic

1. The "Accumulator" annuity is a two-tiered, deferred annuity contract whereby the purchaser's premiums are paid and accumulated with a one time "bonus" being paid on the initial premium payment and interest being credited to these amounts. The annuities had both an annuitization value and a cash value and after the first year, the purchaser could elect to receive interest only payments over a five year period or defer the payment of interest until it was paid in a lump sum together with the amount of the initial investment. (Statement of Undisputed Facts and Answer thereto, ¶s 9–11, 14, 18).

2. These include LifeUSA Insurance Company, Inc., Allianz Insurance Company of North America ("Allianz") and its predecessor company, North American Life and Casualty ("NALAC"). In June, 1988, LifeUSA and Allianz entered into a Service Agreement under which LifeUSA was to market and administer certain Allianz life insurance and annuity contracts in Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, Ohio, Pennsylvania, Rhode Island and Vermont. On January 1, 1995, however, the service agreement was replaced by a Joint Marketing Agreement which enabled LifeUSA to administer and market Allianz life insurance and annuities in every state except New York. The annuity contracts at issue in this case were issued by Allianz and administered and serviced by LifeUSA. (Statement of Undisputed Facts and Answer thereto, ¶s 2–6).

principal and interest payments over a minimum of five years with the balance being paid a "compounded daily" interest rate of less than three percent ..., periodic interest only payments for a minimum of five years with the entire principal remaining with LifeUSA earning a current interest rate unilaterally defined by LifeUSA .... or death benefits to the purchaser's estate which ... must select from the aforementioned three options."

Plaintiffs here fall into two categories: (1) those who, like Drew Krapf and Esther Rosenblum, purchased Accumulator annuity policies between August 1, 1989 and October 1, 1997 ("the class period") and have not, to date, withdrawn any funds such that their principal and interest remains with the defendant company; and (2) those like Joseph Benevento, Rita Baskin, Edward Maze and Bruce Compaine who also purchased their Accumulator annuities during the class period but elected to withdraw their funds through the minimum five-year payout period.

By way of the pending motion, Defendant contends that it is entitled to judgment in its favor as a matter of law as to all of the plaintiffs and all of their claims for relief. Specifically, Defendant urges this Court to find that (1) the plaintiffs have insufficient evidence to sustain their causes of action for negligent and fraudulent misrepresentation, unjust enrichment, injunctive relief, negligence and breach of the duty of good faith and fair dealing and, (2) the plaintiffs' claims are barred by the applicable statutes of limitations and, in the case of plaintiffs Baskin, Maze and Compaine, barred by Florida's and New Jersey's Economic Loss Rules. Alternatively, Defendant contends that the negligence and negligent misrepresentation claims of Messrs. Benevento, Krapf, Maze and Compaine and Mrs. Rosenblum are barred by the doctrine of contributory negligence and, in the case of Plaintiffs Benevento, Krapf and Rosenblum, by their failure to have sustained any out-of-pocket losses. We shall address each of these arguments in turn.

### Standards Governing Motions for Summary Judgment

The standards for determining whether summary judgment is properly entered in cases pending before the district courts are governed by Fed.R.Civ.P. 56. Subsection (c) of that rule states, in pertinent part,

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

In this way, a motion for summary judgment requires the court to look beyond the bare allegations of the pleadings to determine if they have sufficient factual support to warrant their consideration at trial. *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287 (D.C.Cir.1988), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). *See Also: Aries Realty, Inc. v. AGS Columbia Associates,* 751 F.Supp. 444 (S.D.N.Y.1990).

As a general rule, the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a summary judgment motion, the court must view the facts in the light most favorable to the party opposing the motion and all reasonable inferences

from the facts must be drawn in favor of that party as well. *U.S. v. Kensington Hospital,* 760 F.Supp. 1120 (E.D.Pa.1991); *Schillachi v. Flying Dutchman Motorcycle Club,* 751 F.Supp. 1169 (E.D.Pa.1990).

When, however, "a motion for summary judgment is made and supported [by affidavits or otherwise], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate may be entered against [it]." Fed.R.Civ.P. 56(e).

A material fact has been defined as one which might affect the outcome of the suit under relevant substantive law. *Boykin v. Bloomsburg University of Pennsylvania,* 893 F.Supp. 378, 393 (M.D.Pa.1995) citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.,* citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### *Discussion*
### A. Which state's law governs?

At the outset, we are presented with the question of which state's law should be applied to this case. Defendant asserts that this case must be evaluated in the context of the laws of the plaintiffs' respective home jurisdictions. Plaintiffs Benevento, Krapf and Rosenblum are residents of Pennsylvania. Plaintiffs Compaine and Maze, in turn, are residents of New Jersey and Plaintiff Baskin is a Florida resident. Defendant would therefore have this Court consider the plaintiffs' claims under Pennsylvania, New Jersey and Florida law. Plaintiffs, on the other hand, argue that the law of the Defendant's home state, Minnesota, should be applied.

■ It is now well-settled that in diversity actions, a federal court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *United Services Automobile Ass'n. v. Evangelista,* 698 F.Supp. 85, 86 (E.D.Pa.1988). Pennsylvania has adopted a choice of law/conflicts methodology which combines the approaches of both the Second Restatement (contacts establishing significant relationships) and "interest" analysis (qualitative appraisal of the relevant state's policies with respect to the controversy). *Carrick v. Zurich–American Insurance Group,* 14 F.3d 907, 909 (3rd Cir.1994) quoting *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3rd Cir.1991); *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). Pennsylvania's choice of law analysis has therefore been said to entail two steps: first, the court must look to see whether a false conflict exists. *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3rd Cir. 1996). *See Also: Hughes v. Prudential Lines, Inc.,* 425 Pa.Super. 262, 624 A.2d 1063, 1066, n. 2 (1993). Then, if there is no false conflict, the court must determine which state has the greater interest in the application of its law. *Id.,* citing, *inter alia, Cipolla v. Shaposka,* 439 Pa. 563, 565, 267 A.2d 854 (1970). A false conflict exists when two jurisdictions have applicable law but applying the law of one jurisdiction would not result in impairing the governmental interests of the other. *Teti v. Huron Insurance Co.,* 914 F.Supp. 1132, 1134 (E.D.Pa.1996).

Here, both Plaintiffs and Defendant evidently agree that no false conflict is present as neither party makes any argument whatsoever as to whether the interests of Pennsylvania, Minnesota, New Jersey or Florida would be impaired by application of the law of any of the other jurisdictions. Accordingly, we shall assume that the conflict is genuine and turn now to examine the contacts and interests of the competing jurisdictions.

■ In accord with Restatement (Second) Conflict of Laws § 188, the courts

have recommended that resolution of a choice of law question involving a contract dispute be based upon consideration of the following factors: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Compagnie des Bauxites de Guinee v. Argonaut–Midwest Insurance Company,* 880 F.2d 685, 689 (3rd Cir.1989); *Gould v. Continental Casualty Co.,* 822 F.Supp. 1172, 1175 (E.D.Pa.1993). *See Also: Doe v. Provident Life and Accident Insurance Co.,* 936 F.Supp. 302, 306, n. 3 (E.D.Pa. 1996). Pennsylvania courts have determined that contracts are "made" at the place of delivery. *USAA v. Evangelista, supra,* 698 F.Supp. at 86–87.

▮ In this case, the evidence shows that while the defendant is licensed to do business in other states, including Pennsylvania, it was incorporated and maintains its principal place of business in Minnesota. Plaintiffs argue that the annuity and the advertising and marketing materials used to sell the policies, were designed in Minnesota but that they received their Accumulator Annuity policies in their home states of Pennsylvania, New Jersey and Florida. The sales agents who sold the annuities to the plaintiffs operated, and from all appearances, themselves reside within the plaintiffs' home states. Viewing these facts in the context of the above-referenced factors, we therefore find that the contracting, negotiation and performance of the contract all took place in the state(s) in which the plaintiffs reside and that it is therefore the states in which the plaintiffs are domiciled which have the greater interest(s) in the outcome of this lawsuit. *Compagnie des Bauxites de Guinee v. Argonaut–Midwest Insurance Company,* 880 F.2d 685, 689 (3rd Cir.1989). We therefore conclude that the laws of Pennsylvania, New Jersey and Florida

should be applied to evaluate the plaintiffs' claims here.

**B. The "Independence" of LifeUSA's Agents.**

LifeUSA next asserts that it cannot be held liable for the misrepresentations and non-disclosures allegedly made by the agents who sold the plaintiffs their annuity policies because those sales people were acting as the agents of the individual insureds, not the defendant company.

▮ Although the question of whether a principal-agent relationship exists is ordinarily one of fact for the jury, where the facts giving rise to the relationship are not in dispute, the question is one which may be properly decided by the court. *Joyner v. Harleysville Insurance Company,* 393 Pa.Super. 386, 393, 574 A.2d 664, 668 (1990), citing, *inter alia, Breslin by Breslin v. Ridarelli,* 308 Pa.Super. 179, 454 A.2d 80 (1982); *National Premium Budget Plan Corp. v. National Fire Insurance Co. of Hartford,* 97 N.J.Super. 149, 234 A.2d 683, 708 (Law Div.1967), *aff'd,* 106 N.J.Super. 238, 254 A.2d 819 (App.Div. 1969). Generally, an insurance agent is employed by an insurance company and represents the insurer's interests. An insurance broker, on the other hand, is not employed by any specific insurance company and acts as a middle man between the insured and the insurance company soliciting the public and then placing the requested insurance with a company. *Rich Maid Kitchens v. Penn. Lumbermens Mutual Insurance Co.,* 641 F.Supp. 297, 303 (E.D.Pa.1986).

▮ An insurance broker, of course, may be an agent for both the insured and the insurer. *Luber v. Underwriters at Lloyd's,* 1992 WL 346467 (E.D.Pa.1992) at *3; *National Premium v. National Fire Insurance Co., supra.* For example, where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker permitting him to choose

which company shall become the insurer, the broker is usually deemed to be the agent of the insured—not the insurer. *Taylor v. Crowe,* 444 Pa. 471, 282 A.2d 682, 683 (1971).

■ Thus, the agency status of a broker depends on the relationship between the broker and the insured as well as that between the broker and the insurer. *Fisher v. Aetna Life Insurance & Annuity Co.,* 39 F.Supp.2d 508 (M.D.Pa.1998), *aff'd* 176 F.3d 472 (3rd Cir.1999). For a broker to be found to be an agent of the insurer, there must be some evidence of an authorization, or some fact from which a fair inference of an authorization by the company to the broker might be deduced. *Luber,* at *3 citing *Taylor v. Crowe,* 282 A.2d at 684. *See Also: Joyner v. Harleysville,* 393 Pa.Super. at 392–393, 574 A.2d at 667–668; *Bolus v. United Penn Bank,* 363 Pa.Super. 247, 525 A.2d 1215 (1987); *National Premium,* 234 A.2d at 708–709.

■ Applying these principles to this action, we find that each of the plaintiffs' sales agents appear to have had long-standing relationships with the plaintiffs, having previously advised them on financial and insurance matters. It further appears that none of the agents exclusively sold insurance and annuities for LifeUSA and, in fact were selling the products of other companies as well in the same time frame during which they sold the plaintiffs their LifeUSA Accumulator annuities. While these facts certainly suggest that these sales people were the agents of the individual plaintiffs and not the company, there is also ample evidence that LifeUSA trained, educated and in other respects held these sales agents out as having the authority to speak for and represent the company and that it made and treated those people who sold its products "owners" of the company. Indeed, company stock, company-paid trips and other fringe benefits and incentives were a part of the compensation package given a salesperson upon the sale of a LifeUSA policy. In addition, these same agents were identified on the periodic account statements and summaries which the plaintiffs received from the defendant company as LifeUSA representatives. Since we believe that a jury could find from this evidence that the plaintiffs were justified and reasonable in their beliefs that the sales agents from whom they purchased their annuities were in fact representatives and agents of LifeUSA, we must decline to grant summary judgment in defendant's favor on the basis of this argument.

### C. Plaintiffs' Justifiable Reliance on Defendant's Alleged Misrepresentations and Non–Disclosures.

Defendant next argues that it is entitled to judgment in its favor as a matter of law with respect to all of the plaintiffs on Counts II and III of the Complaint alleging fraudulent non-disclosures and misrepresentations and negligent misrepresentations. It is Defendant's specific contention that neither Pennsylvania, New Jersey nor Florida law will permit a plaintiff to rely on statements that are demonstrably contradicted by a written agreement.

■ It is true that for a plaintiff to prevail on claims for fraud (or intentional misrepresentation) and negligent misrepresentation under the laws of Pennsylvania, New Jersey and Florida, he or she must prove justifiable reliance upon the misrepresentation at issue.[3] Determining

---

**3.** In Pennsylvania, the tort of intentional or fraudulent misrepresentation consists of the following elements: (1) a false representation of an existing fact or nonprivileged failure to disclose, (2) which is material to the transaction at hand, (3) made with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intention of misleading another into relying on it; (5) justifiable reliance on the misrepresentation and (6) a resulting injury proximately caused by the reliance. *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994); *Huddleston v. Infertility Center of America, Inc.,* —— Pa.Super. ——, 700 A.2d 453, 461 (1997); *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1142 (3rd Cir.1993). Liability for negligent misrepresentation will arise if (1) the misrepresenta-

whether reliance on a misrepresentation is justified is generally dependent, at least in part, upon such factors as the respective intelligence and experience of the parties, the relationship between them and the opportunities, if any, to ascertain the truth of the representation at issue. *Wittekamp v. Gulf & Western,* 991 F.2d at 1144, citing, *inter alia, Emery v. Third National Bank of Pittsburgh,* 314 Pa. 544, 171 A. 881, 882 (1934) and *B.O. v. C.O.,* 404 Pa.Super. 127, 590 A.2d 313, 316 (1991); *Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc.,* 913 F.Supp. 837, 844 (D.N.J.1995); *Judson v. Peoples Bank and Trust Co.,* 25 N.J. 17, 25, 134 A.2d 761, 765 (1950). *See Also: Sheen v. Jenkins,* 629 So.2d 1033, 1035 (Fla.App. 4 Dist.1993); *First Union Brokerage v. Milos,* 717 F.Supp. 1519, 1524 (S.D.Fla.1989).

Here, of course, the alleged misrepresentations upon which Plaintiffs' claims are founded emanate from the differences between what their respective sales agents told them the accumulator annuities would do and how they would work and the language of the actual written policies themselves.

 It is well-settled that the task of interpreting a written contract is usually performed by a court rather than by a jury and that the goal of that task is to ascertain the intent of the parties as manifested by the language of the written instrument. In determining the reasonable expectations of an insured, courts must examine the totality of the insurance transaction involved. But while the insured's reasonable expectations may be the focal point in interpreting the contract, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous. *McAllister v. Millville Mutual Insurance Co.,* 433 Pa.Super. 330, 339–340, 640 A.2d 1283 (1994). *See Also: Bateman v. Motorists Mutual Insurance Co.,* 527 Pa. 241, 244, 590 A.2d 281, 283 (1991); *Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 388 A.2d 1346 (1978). *In accord, Prudential Property and Casualty Ins. Co. v. Swindal,* 622 So.2d 467 (Fla.1993); *Jabour v. Calleja,* 731 So.2d 792 (Fla.App. 3 Dist. 1999); *Florida Auto. Finance Corp. v. Reyes,* 710 So.2d 216 (Fla.App. 3 Dist. 1998); 704 So.2d 176 (Fla.App. 4 Dist. 1997); *Lindheimer v. St. Paul Fire and Marine Ins. Co.,* 643 So.2d 636 (Fla.App. 3 Dist.1994).

As the Pennsylvania Supreme Court articulated in *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers Association Insurance Company,* 512 Pa. 420, 426, 517 A.2d 910, 912 (1986) and in *Standard Venetian Blind Co. v. American Empire Insurance Co.,* 503 Pa. 300, 304, 469 A.2d 563, 566 (1983), (both citing *Gonzalez v.*

tion is of a material fact; (2) the representor knew of the misrepresentation but (3) made the misrepresentation without knowledge of its truth or falsity or made it under such circumstances in which he ought to have known of its falsity; (4) the representor intended the representation to induce another to act on it; (5) the other person justifiably relied upon the misrepresentation; and (6) if in so relying, suffered damages or injury. *City of Rome v. Glanton,* 958 F.Supp. 1026, 1039 (E.D.Pa.1997); *Amoco Oil Co. v. McMahon,* 1997 WL 50448 (E.D.Pa.1997).

To establish fraud under New Jersey law, a plaintiff must prove (1) a material misrepresentation of a past or present fact; (2) knowledge by the defendant of its falsity; (3) that defendant intended the misrepresentation be relied upon; (4) reasonable reliance by the plaintiff; and (5) resulting damages. *Carroll*

*v. Cellco Partnership,* 313 N.J.Super. 488, 713 A.2d 509, 516 (App.Div.1998). Similarly, to establish a cause of action for negligent misrepresentation, there must be proof that an incorrect statement was negligently made and justifiably relied upon and that injury was sustained as a consequence of that reliance. *Id.,* citing *inter alia, Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 473, 541 A.2d 1063 (1988) and *Gross v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 303 N.J.Super. 336, 344–45, 696 A.2d 793 (Law Div.1997).

To establish claims for both intentional and negligent misrepresentation under Florida law requires a showing of (1) a material misrepresentation or omission (2) upon which the plaintiff reasonably and justifiably relied. *Butterworth v. Quick & Reilly, Inc.,* 171 F.R.D. 319, 321 (M.D.Fla.1997).

*United States Steel Corp.* 484 Pa. 277, 398 A.2d 1378 (1979), *Community College of Beaver County v. Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267 (1977) and *Mohn v. American Casualty Co. of Reading,* 458 Pa. 576, 326 A.2d 346 (1974)):

> Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.... Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language ... In the absence of proof of fraud, the failure to read the contract is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof .... (citations omitted).

*In accord, Wirt v. Central Life Assurance Company,* 613 So.2d 478 (Fla.App. 2 Dist. 1992). (A party is not presumed to know the contents of any document he or she signs in all circumstances regardless of the underlying cause of action; fraudulent concealment can toll the running of a statute of limitations when the fraud perpetrated upon the injured party places him in ignorance of his right to sue).

 This is not to say that insurance contracts are to be reviewed in a vacuum or without regard to the factual context in which the claim arose. Rather, courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Regardless of the ambiguity (or lack thereof) inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, etc.), the public has a right to expect that they will receive something of comparable value in return for the premium paid. *Tonkovic v. State Farm Mutual Automobile Insurance Co.,* 513 Pa. 445, 456, 521 A.2d 920, 926 (1987). *See Also: Prudential Property and Casualty Ins. Co. v. Swindal* and *Lindheimer v. St. Paul Fire and Marine Insurance Co.,* both *supra.* Thus, where an individual

applies and pays for specific insurance coverage, the insurer may not unilaterally change the coverage or issue a policy differing from what the insured requested and paid for without affirmatively showing that the insured was notified of, and understood the change, regardless of whether the insured read the policy. *Tonkovic,* 513 Pa. at 455, 521 A.2d at 925. The burden is not on the insured to read the policy to discover such changes or not read it at his peril. *Tonkovic,* 513 Pa. at 454, 521 A.2d at 925. *In accord, Meier v. New Jersey Life Insurance Company,* 101 N.J. 597, 612, 503 A.2d 862, 869 (1986); *Di Orio v. New Jersey Manufacturers Ins. Co.,* 79 N.J. 257, 269–270, 398 A.2d 1274 (1979); *Allen v. Metropolitan Life Insurance Co.,* 44 N.J. 294, 208 A.2d 638 (1965); *Von Milbacher v. Teachers Insurance and Annuity Ass'n.,* 1988 WL 113353 (D.N.J.1988) at *2. (an insurance agreement subject to conflicting reasonable interpretations will be enforced according to that understanding which favors the insured and for the purpose of rendering a fair interpretation of the boundaries of insurance coverage). *See Also: Wirt v. Central Life Assurance Co., supra.*

 In application of all of the foregoing to this case, it appears that none of the plaintiffs and none of the sales agents who sold plaintiffs their annuity policies read the contracts which LifeUSA sent them after payment of the initial premiums. Prior to the plaintiffs' purchase of their annuities, the sales agents had informed the plaintiffs as to the workings of the accumulator annuity in accordance with the information, education or training which they had received or reviewed with them the sales and promotional materials and brochures which the company had provided. Given that the agents were available in the event any questions should later arise, none of the plaintiffs felt that it was necessary to read their contracts or to read them in their entirety.

The record thus far developed in this matter further reflects that due at least in

part to the distinction between the actual language of the contracts and what they were told by company representatives at seminars, in training sessions and in sales and promotional literature, each of the sales agents themselves did not understand and did not accurately inform the plaintiffs as to what the interest rates would be over the duration of the contracts, how the selection of a particular payout option could affect the overall value and worth of the annuity, or when, how or what happened when a policyholder elected to terminate the contract. It thus appears that the agents themselves may have been misled. From this evidence, we find sufficient indicia that the defendant (at least) negligently misrepresented the policy terms and conditions to its representatives and ultimately, its policyholders and (at worst) that it intentionally did so. We there find that sufficient justification exists for the submission of these claims to a jury.

Moreover, while at first blush, the annuity policies appear to be written in plain language, upon closer examination in conjunction with the Declaration of LifeUSA Vice–President Neal McKay, we too find numerous ambiguities. For example, according to Vice President McKay, "[t]he Annuitization Value is comprised of premiums, the bonuses credited to such premiums, plus accumulated interest ..." (Defendant's Appendix of Exhibits to Motion for Summary Judgment, Volume I, Exhibit "A", ¶ 8). According to the Accumulator Annuity contracts, however, "Annuitization Value is the amount which will be used to provide an annuity. It is described in the Annuitization Value section." (Exhibit A(1)(A), at p. 2). Under the "Annuitization Value" section of the contract,

Annuitization Value premium payments are equal to 100% of any payment you make. The Annuitization Value on any specified date is equal to:

1. The Annuitization Value on the last monthly anniversary date plus accrued interest from that date to the specified date.

plus

2. All premiums paid plus accrued interest from the date of receipt to the specified date less any refunds since the last monthly anniversary date.

minus

3. The proportionate reduction for any partial withdrawals since the last monthly anniversary date.

Mr. McKay also observes that "[a]ll of the named plaintiffs deposited their funds into the annuity as a single payment, which is referred to and treated in the contract as "excess premium" and that the Cash Value is equal to 95% of excess premiums plus accumulated interest," and that "[d]uring the first few years of the Contracts, the Cash Value may be less than the initial premium paid, because of the 5% difference between the initial amount paid and the amount credited to calculating the Cash Value." (McKay Decl. ¶s11, 12). Our review of the contracts, however, failed to uncover any instance where the term "excess premium" is either used or defined and the only mention of this 5% differential between amount paid and cash value that we could locate in the contracts was at p. 6 and provided that "[p]remium paid during the first five policy years *in excess of* the planned annual premium will be credited to the Cash Value in an amount equal to 95% of the excess amount paid ...." (emphasis supplied). There is no mention as to why the cash value is 5% less than the amount actually paid and since this language suggests that 5% will only be deducted from premiums paid over and above the planned annual premium, we find the contract ambiguous on this point as well.

Perhaps most confusing of all is the representation that "[t]o receive the full Annuitization Value, that is the premium, the bonus amount, and accumulated credited interest, the contract owner must hold the contract at least one year and then

elect to annuitize the contract over a minimum of five years." (McKay Decl. ¶ 14). Indeed, it appears from Mr. McKay's declaration and the deposition testimony of the plaintiffs, the sales agents and other LifeUSA representatives such as Charles Kavitsky that the Annuitization Values are significantly greater than the Cash Values and that for a policy holder to obtain the higher value, he or she must, one year after depositing the funds, elect one of the annuity payout options and begin receiving payments. Evidently then, policyholders such as Esther Rosenblum and Drew Krapf, who leave the full amount of their premium "in deferral" for an extended period, reap a lower benefit than do those who receive payments over a designated period of time. This procedure, however, was not made clear to either the plaintiffs nor their sales agents nor does it appear clear from a reading of the contracts. To be sure, the matter is further clouded by the introductory discussion of the Flexible Premium Deferred Annuity found on the first page of each plaintiff's contract(s):

> The Flexible Premiums paid for the policy will be accumulated to provide an income payable at the Annuity Date. A death benefit is payable before the Annuity Date. Annuity premiums payable at option of the owner. Non-participating—No annual dividends.

When read together with the Policy Schedule "Note" and page 5 of the contracts that "[t]he normal annuity date is the latest of the policy anniversary following the annuitant's 75th birthday or ten years from the policy date," several interpretations are possible. Among these are that it would not be necessary or possible

to begin receiving payments under the contract until the annuity date or that the longer the premiums were left on account or in deferral, the greater the ultimate benefits would be.

Finally, yet another ambiguity is presented by Mr. McKay's statement that "[p]rior to the exercise of a payout option, all contract owners receive Quarterly Statements. These Quarterly Statements state the Annuitization Value, the annual credited interest rate and the Cash Value in the event of a full surrender of the contract." (McKay Decl., ¶ 45). The contracts, on the other hand, state only "Annual Report—We will send you a report at least once a year which shows the premium payments, interest credited, partial withdrawals and the current account value." The plaintiffs, of course, complain that LifeUSA does not provide any account statements or reports once a payout option is selected.

Accordingly, in view of all of the foregoing ambiguities, among others, contained in the written documents upon which defendant relies, we can reach no other conclusion but that defendant's motion for summary judgment with respect to Counts II and III must be denied.

### D. Dismissal of the Non–Disclosure Claims of Plaintiffs Benevento, Krapf and Rosenblum.

Defendants alternatively seek the dismissal of Counts II and III with respect to Joseph Benevento, Esther Rosenblum and Drew Krapf to the extent that those plaintiffs' fraud claims are premised upon the defendant's alleged non-disclosures.[4]

---

**4.** In support of this contention, defendants cite *Lazin v. Pavilion Partners,* 1995 WL 614018 (E.D.Pa.1995). In that case, Judge Padova granted summary judgment with respect to plaintiff's claim that the defendant developer should be held liable for his consulting and other fees under the theory of negligent misrepresentation for, *inter alia,* failing to disclose that it had secretly had discussions with the State of New Jersey

about leasing land on which plaintiff had an option. In so ruling, Judge Padova reasoned: "I disagree with Plaintiff's assertion that an omission can constitute a negligent misrepresentation. Plaintiff points to no case supporting his theory. Under Pennsylvania law, one of the four elements that Plaintiff must establish to make out a claim for negligent misrepresentation is that Defendant actually misrepresented a material fact to him ....(citation omitted). Non-disclo-

The Pennsylvania Courts have had several opportunities to elaborate on those actions which would constitute fraudulent behavior and have stated that "fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth or look or gesture. It is any artifice by which a person is deceived to his disadvantage." *Tunis Brothers Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 731 (3rd Cir.1991); *Smith v. Renaut*, 387 Pa.Super. 299, 305, 564 A.2d 188, 191 (1989), *both citing, In re McClellan's Estate*, 365 Pa. 401, 407, 75 A.2d 595, 598 (1950) and *In re Reichert's Estate*, 356 Pa. 269, 274, 51 A.2d 615, 617 (1947). A fraud also occurs when one is induced to assent when he would not otherwise have done so. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 107, 464 A.2d 1243, 1251–1252 (1983).

■■■■ Thus, fraud arises where the misrepresentation is knowingly false, where there is an intentional concealment calculated to deceive, or where there is a nonprivileged failure to disclose. *Smith v. Renaut*, 387 Pa.Super. at 306, 564 A.2d at 192. While a concealment may constitute fraud, however, mere silence is not sufficient in the absence of a duty to speak. *Id.*

■■■ Pennsylvania courts analyzing whether there was a duty to speak rely almost exclusively on the nature of the contract between the parties and the scope of one party's reliance on the other's representations; in virtually no Pennsylvania case has a defendant been held to have a duty to speak when both it and the plaintiff were sophisticated business entities entrusted with equal knowledge of the facts. *Duquesne Light Co. v. Westinghouse*, 66 F.3d at 612. Where, however, a confidential relationship may be shown to have existed between a plaintiff and defendant, the duty to speak may arise. *Weisblatt v. Minnesota Mutual Life Insurance Co.*, 4 F.Supp.2d 371, 380–381 (E.D.Pa.1998).

■■■ Whether a confidential relationship exists is a mixed question of law and fact and must be determined from all the surrounding facts and circumstances relevant to the case. *Id.*, at 381, *citing, inter alia, Stewart v. Hooks*, 372 Pa. 542, 94 A.2d 756 (1953). Such a relationship may be found where there has been a showing of (1) a relationship of actual closeness; (2) a substantial disparity in the parties' positions; and (3) actual reliance by the settlor on the person in the position of trust. *Id.*

■■■ In this case, again, the record clearly reflects that each of the plaintiffs had relationships of somewhat long standing with each of the sales agents from whom they purchased their annuity policies such that each of them relied upon their respective agents' expertise for general financial advice and for advice and counsel in deciding to purchase the defendants' annuities. It further appears that each of the agents, in turn, relied upon the sales information, brochures, training and educational materials which they received either from LifeUSA directly or from such corporate representatives as Ed Omert and Frank Miller, that they themselves may have been deceived, or at least confused, by the materials which they received and that this deception or confusion was relayed to the plaintiffs. We find that the plaintiffs had close relationships of

sure of a material fact would give rise to a cause of action for fraudulent non-disclosure, not for negligent misrepresentation . . ."
In this case, however, Plaintiffs' Complaint raises claims not only for fraudulent and negligent misrepresentation, but also for fraudulent non-disclosure. It should be noted that the tort of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation. *Duquesne Light Company v. Westinghouse Electric Corporation*, 66 F.3d 604, 612, n. 6 (3rd Cir. 1995), citing *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994).

trust with the sales agents and that they relied upon the misinformation in making their buying decisions. While each of the plaintiffs appear educated and intelligent, they are clearly not "sophisticated business entities" such that the disparity between the parties' positions may be discounted. So saying, we believe that the agents, as LifeUSA representatives, can be held to have had a duty to disclose the material facts underlying the operation of the annuities. We shall therefore allow the fraudulent non-disclosure claims in Counts II and III to stand.

### E. Dismissal of Tort Claims of Plaintiffs Baskin, Compaine and Maze Under the Economic Loss Rules of Florida and New Jersey.

Defendants next move for the dismissal of the tort claims of Rita Baskin, Bruce Compaine and Edward Maze set forth in Counts II, III and V of the complaint as they are barred by the "Economic Loss Rules" of Florida and New Jersey.

■ Under Florida's economic loss doctrine, a party may not raise tort claims to recover solely economic losses arising from a breach of contract unless there is evidence of physical injury or damage to other property. *R.A.M. Sourcing Agency, Inc. v. Seaboard Marine, Ltd.*, 995 F.Supp. 1465, 1467 (S.D.Fla.1997). The economic loss rule normally bars tort recovery in an action that arises out of contractual relations. *Stephens v. Nationwide Mutual Insurance Co.*, 722 So.2d 208, 209 (Fla.App. 2 Dist.1998). Although originally, the rule applied only to products liability cases, it has been extended to apply to service contracts as well as to contracts for the purchase of goods. *Casa Clara Condominium Association v. Charley Toppino and*

*Sons, Inc.*, 620 So.2d 1244 (Fla.1993); *R.A.M. Sourcing*, 995 F.Supp. at 1467.[5]

■ The economic loss rule, however, has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla.1996). Thus, the Florida Courts have held that claims for fraudulent inducement and negligent misrepresentation are not barred by the economic loss rule. *See: Moransais*, 1999 WL 462629 at *9; *P.K. Ventures, Inc. v. Raymond James & Associates, Inc.*, 690 So.2d 1296, 1297 (Fla. 1997); *HTP, Ltd.*, 685 So.2d at 1239; *Woodson v. Martin*, 685 So.2d 1240 (Fla. 1996); *Randolph v. Mitchell*, 677 So.2d 976, 977 (Fla.App. 5 Dist.1996).

New Jersey's law in this area appears similar to that of Florida. The New Jersey Supreme Court first adopted the economic loss doctrine barring tort remedies for commercial but not consumer transactions in *Spring Motors Distributors, Inc. v. Ford Motor Co.*, 98 N.J. 555, 577–578, 489 A.2d 660, 671–672 (1985) when it held that a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., but not in strict liability or negligence. *See Also: Boyes v. Greenwich Boat Works, Inc.*, 27 F.Supp.2d 543, 550 (D.N.J.1998). In *Alloway v. General Marine Industries,L.P.*, 149 N.J. 620, 695 A.2d 264 (1997), the doctrine was held applicable to consumer transactions as well. *Boyes*, 27 F.Supp.2d at 551.

---

**5.** The essence of the early holdings discussing the rule was to prohibit a party from suing in tort for purely economic losses to a product or object provided to another for consideration, the rationale being that in those cases "contract principles are more appropriate than tort principles for resolving economic

loss without an accompanying physical injury or property damage." *Moransais v. Heathman*, — So.2d ——, 1999 WL 462629, at *7 (Fla.1999) citing, *inter alia, Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899, 902 (Fla.1987).

In New Jersey then, economic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits, including the diminution in value of a product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold. *Alloway,* 149 N.J. at 627, 695 A.2d at 267.

It appears, however, that the New Jersey Courts are not comfortable with an economic loss rule which is *per se* prohibitive and it is for that reason that numerous exceptions have been carved out over the years. Among these exceptions, is one where there exists a "special relationship" between the alleged tortfeasor and the individual or business deprived of its economic expectations such as occurs where negligent misrepresentation is averred resulting in liability for specially foreseeable economic losses. *People Express Airlines, Inc. v. Consolidated Rail Corporation,* 100 N.J. 246, 256–257, 495 A.2d 107, 112 (1985); *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 143 (1983). *See Also: Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354 (1995); *Faktor v. American Biomaterials Corp.,* 1991 WL 336922 (D.N.J. 1991).

In light of the foregoing authority and given our previous findings that the plaintiffs have produced sufficient evidence that they had relationships of trust with the sales agents upon whose representations they relied in deciding to purchase defendant's annuities, we likewise decline to enter summary judgment in defendant's favor on Counts II, III and V of the complaint on the basis of the economic loss doctrine.

### F. Applicability of Doctrine of Contributory Negligence to Bar the Negligence and Negligent Misrepresentation Claims of Plaintiffs Benevento, Krapf, Rosenblum, Compaine and Maze.

Defendant next asserts that under Pennsylvania and New Jersey law, contributory negligence operates to bar the negligence and negligent misrepresentation claims of all of the plaintiffs save Rita Baskin, a Florida resident. We disagree.

Simply, contributory negligence is no longer a valid defense under New Jersey law given its abrogation by the concept of comparative negligence. *Cordy v. Sherwin Williams Co.,* 975 F.Supp. 639, 647 (D.N.J.1997), citing *McGrath v. American Cyanamid Co.,* 41 N.J. 272, 276, 196 A.2d 238 (1963); N.J.S.A. § 2A:15–5.1. Although there has been no specific pronouncement from the New Jersey Supreme Court as to the applicability of comparative negligence principles in cases such as this one, it has been held that New Jersey has, *de facto,* adopted the comparative negligence doctrine for similar cases involving the alleged negligence of an insurance broker. *Gallelli v. Professional Insurance Management,* 1994 WL 45729 (E.D.Pa.1994) at *3.

The Pennsylvania Superior Court, on the other hand, has held that the Pennsylvania Comparative Negligence Act, 42 Pa.C.S. § 7102, does not apply to negligence actions where the defendant failed to procure an insurance policy and failed to notify the plaintiff that the insurance had not been obtained. Rather, that Court determined that the doctrine of contributory negligence was properly applied in those cases and operated to bar the plaintiff from recovery if his negligence contributed to the result. *Rizzo v. Michener,* 401 Pa.Super. 47, 584 A.2d 973, 976 (1990). While it is unclear whether the Pennsylvania Supreme Court would issue a ruling consistent with that of the Superior Court, the existence of negligence and of contributory or comparative negligence is usually a question to be submitted to the jury upon proper instructions and the trial court should not remove the issue unless the facts leave no room for doubt. *Rizzo,* 584 A.2d at 976–977 citing, *Gallo v. Yamaha Motor Corp.,* 363 Pa.Super. 308, 526

A.2d 359 (1987); *East Texas Motor Freight, Diamond Division v. Lloyd*, 335 Pa.Super. 464, 484 A.2d 797 (1984); *Robinson v. City of Philadelphia*, 329 Pa.Super. 139, 148, 478 A.2d 1, 5 (1984). Accordingly, we shall leave the plaintiffs' negligence and negligent misrepresentation claims to the jury.

### G. Dismissal of Plaintiffs' Claims for Breach of the Duty of Good Faith and Fair Dealing.

Defendant also moves for the dismissal of plaintiffs' claims for breach of the duty of good faith and fair dealing on the grounds that all of the conduct on which plaintiffs' claims are based occurred prior to the formation of the contracts and are therefore not actionable.

Under the laws of both Florida and New Jersey, a duty of good faith and fair dealing is implied in all insurance contracts. *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 207 A.2d 522 (1965); *Pickett v. Lloyds*, 252 N.J.Super. 477, 485, 600 A.2d 148, 152 (App.Div.1991); *North American Van Lines, Inc. v. Lexington Insurance Co.*, 678 So.2d 1325, 1330–1331 (Fla.App. 4 Dist.1996). Where a breach of an implied duty of good faith is claimed, the duty of good faith must relate to the performance of an express term of the contract—it is not an abstract and independent term of a contract which may be asserted as a source of the breach when all other terms have been performed pursuant to the contract requirements. *Hospital Corporation of America v. Florida Medical Center, Inc.*, 710 So.2d 573, 574 (Fla. App. 4 Dist.1998). *See Also: Opperman v. Nationwide Mutual Fire Insurance Co.*, 515 So.2d 263, 266 (Fla.App. 5 Dist.1987). Thus, although neither the New Jersey nor the Florida Supreme Court has spoken on the issue, the intermediate appellate courts in those jurisdictions have suggested that when a breach of the duty of good faith and fair dealing can be shown, liability may be had in tort as well as in contract. *See, e.g.: Pickett*, 252 N.J.Super. at

490, 600 A.2d at 155; *Opperman*, 515 So.2d at 267.

In contrast, under Pennsylvania law, every contract does not imply a duty of good faith. *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 701 (3rd Cir.1993). Instead, the duty of good faith and fair dealing is limited to special types of contracts, involving special relationships between the parties. *Falbo v. State Farm Life Insurance Co.*, 1997 WL 116988 at *6 (E.D.Pa.1997). Insurance contracts have been held to just such special types of contracts and the Pennsylvania Supreme Court has recognized that the "utmost fair dealing should characterize the transactions between an insurance company and the insured." *Id.*, citing, *inter alia, Dercoli v. Pennsylvania National Mutual Insurance Co.*, 520 Pa. 471, 554 A.2d 906, 907–909 (1989). Thus, in Pennsylvania, a contractual common law duty of good faith and fair dealing is implied in insurance agreements. *Greater New York Mutual Insurance Company v. North River Insurance Company*, 872 F.Supp. 1403, 1407 (E.D.Pa.1995), citing, *inter alia, Dercoli*, 554 A.2d at 909 and *Gedeon v. State Farm Mutual Auto. Insurance Co.*, 410 Pa. 55, 188 A.2d 320, 322 (1963).

Unlike New Jersey and Florida, though, Pennsylvania is firm in that it does not recognize a common law cause of action in tort for breach of the duty of good faith and fair dealing. *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 494 Pa. 501, 431 A.2d 966 (1981); *Falbo v. State Farm, supra*, at *7; *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Trust Co.*, 385 Pa.Super. 30, 560 A.2d 151, 154 (1989). As a result, the Pennsylvania legislature enacted 42 Pa.C.S. § 8371, which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%;

(2) Award punitive damages against the insurer;

(3) Assess court costs and attorneys fees against the insurer.

*Keefe v. Prudential Property & Casualty Insurance Co.*, 1998 WL 409011 (E.D.Pa. 1998); *Brown v. Candelora*, Pa.Super., 708 A.2d 104, 109–110 (1998), *allocatur granted*, Pa., 555 Pa. 478, 725 A.2d 176 (1999). Section 8371 did and was intended to create an independent cause of action, separate and distinct from the underlying contractual insurance claims arising from the express terms of the contract of insurance. *Brown*, 708 A.2d at 110 *citing, inter alia, Nealy v. State Farm Mutual Automobile Insurance Co.*, 695 A.2d 790, 793 (Pa.Super.1997); *Romano v. Nationwide Mutual Insurance Co.*, 435 Pa.Super. 545, 550–551, 646 A.2d 1228, 1232 (1994); *March v. Paradise Mutual Insurance Co.*, 435 Pa.Super. 597, 646 A.2d 1254, 1256 (1994). The bad faith statute therefore simply provides an insured with additional damages remedies not previously allowed in contract actions at common law; it does not preclude a claim for breach of the contractual obligation of good faith with the right to recover whatever common law contract damages may be appropriate. *See: Greater New York Mutual v. North River*, 872 F.Supp. at 1408. *See Also: Garvey v. National Grange Mutual Insurance Co.*, 1995 WL 461228 (E.D.Pa.1995) at *3.

 Applying these principles and in carefully reviewing the plaintiffs' complaint and the record thus far developed in this matter, it appears that the plaintiffs are asserting a breach of the common law *contractual* duty of good faith and fair dealing. We further find that plaintiffs have adduced enough evidence that defendant misrepresented the terms and conditions of the annuity contracts, their inter-

est and payout rates and procedures both *prior* to their formation and following the plaintiffs' purchase to warrant the submission of these claims to the jury. Indeed, the testimony of both the plaintiffs and the individual sales agents involved in these transactions contrasts significantly with that of LifeUSA Vice President McKay with regard to the annuitization requirements, the payout terms and conditions and the issuance of account statements or summaries. In the event that the jury should accept the testimony proffered by plaintiffs, we believe that it could find that the defendant breached the duty of good faith and fair dealing implied in its annuity contracts. Accordingly, the motion for summary judgment on these claims is denied as well.

## H. Dismissal of Plaintiffs' Claims for Injunctive Relief and Unjust Enrichment and Bar of the Statutes of Limitations.

 Defendant has also moved for the dismissal of all of the plaintiffs' claims for unjust enrichment and injunctive relief as set forth in Counts I and VI of the complaint and argues that plaintiffs' action is barred in its entirety by operation of the applicable statutes of limitations. To these ends, defendant contends that as plaintiffs have failed to establish that they have conferred any benefit on LifeUSA, the retention of which would be unfair and inequitable or that they have any entitlement to an injunction, judgment in defendant's favor should be entered as a matter of law. Given our findings as discussed *infra*, we believe that the plaintiffs have produced that minimum quantum of evidence necessary to overcome the defendant's summary judgment motion with respect to these last two claims and to raise a genuine issue of material fact as to when the plaintiffs learned or should have learned of the defendant's allegedly improper activities. *See, e.g., Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3rd Cir.1994); *In Re Prudential In-*

*surance Co. of America Sales Practices Litigation,* 975 F.Supp. 584 (D.N.J.1996); *Schenck v. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327 (1995); *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347 (1993). Accordingly, we shall leave the questions of the bar of the statutes of limitations and the sufficiency of the plaintiffs' evidence to prove each of their causes of action until the time of trial.

An order follows.

### ORDER

AND NOW, this day of September, 1999, upon consideration of the Defendant's Motion for Summary Judgment and Plaintiffs' Response thereto, it is hereby ORDERED that the Motion is DENIED for the reasons set forth in the foregoing Memorandum Opinion.