75154. DEL MAZO et al. v. SANCHEZ.
(366 SE2d 333)

BIRDSONG, Chief Judge.

Jacinto del Mazo, appellant/defendant, brings this appeal from the grant of summary judgment to appellee/plaintiff Fred H. Sanchez. Dr. del Mazo heard that Dr. Sanchez was interested in selling his medical practice. At that time Dr. del Mazo was associated with another physician who was involved in a billing problem with Medicare and was desirous of disengaging himself from that type of conflict. Dr. del Mazo spoke with Sanchez concerning the type of practice he had, number of patients, income, and whether he had any problems with insurance, Medicare, Medicaid or malpractice claims. Sanchez informed him there were no problems and that his practice generally brought in $200,000 per year.

Dr. del Mazo said they negotiated a price for the sale of the medical practice. It was a percentage of the last year's income, and del Mazo's accountant, John Duggan, examined the books and confirmed the annual income was approximately $200,000. Duggan said Sanchez led him to believe his records were accurate and told him "he was going to Brazil or somewhere in South America and he was selling his practice. . . ." It was his understanding "the purchase price for Dr.

Sanchez' medical practice was a percentage of the practice's annual collections." Dr. del Mazo said that Dr. Sanchez assured him "his collections were for legitimate services rendered." Dr. del Mazo questioned Dr. Sanchez again after he heard rumors that there might be a problem and Sanchez was asked "if he had engaged in any improper practices or had submitted any improper claims to Medicaid or Medicare. . . . He assured me on each of those occasions that all of his Medicaid and Medicare claims and practices were entirely legitimate and proper."

On July 16, 1982, del Mazo and Sanchez executed an agreement whereby Sanchez agreed to sell del Mazo his "patient files" for $10,000 and included a covenant not to compete for $40,000 to be paid in monthly increments. A first payment of $5,000 was made to Sanchez, and he departed for Bolivia. The agreement provided that the seller retained the rights to his accounts receivable and that del Mazo upon receipt of those checks would deposit them in the seller's checking account in the National Bank of Georgia.

When del Mazo received checks from Medicare and Medicaid for services billed by Dr. Sanchez, he "saw documents from those entities showing that [Sanchez] had repeatedly submitted claims for and was now being paid for procedures he could not have performed, both because . . . Sanchez did not have the skill, training or equipment required to perform colonoscopies, colposcopies, sigmoidoscopies with flexible fiberoptic, cardiac catherizations, or endoscopies." Alma McCauley, Dr. Sanchez' medical assistant from September 1981 until his departure for South America, is familiar with these procedures and in her affidavit stated: "At no time after I came to work for Sanchez [in 1981] did Sanchez ever perform any of the procedures [listed above]. Furthermore, at no time after I came to work for Sanchez did Sanchez have the equipment required to perform any of the procedures identified [above]." McCauley said she was instructed by Dr. Sanchez to post a list of diagnostic codes, and that some diagnostic codes included several types of procedures. After Dr. Sanchez saw a patient, he would give her a diagnostic code and she was directed to bill Medicare and Medicaid for all of the procedures whether they had been performed or not. Between September 1981 and January 1982, Sanchez billed Medicaid and Medicare for procedures he did not perform, including "CBC's and urinalyses that were never performed . . . for other laboratory work and office visits that were never performed, and . . . twice for tests only performed once." The doctor's staff "were giving approximately 12 out of every 14 of his patients injections of B12, iron, or B&B (a combination of B12 and iron)."

McCauley's duties included posting the patient's files. Copies of Medicaid and Medicare claim forms were kept in and were a part of

the patient files from the time she started working there in 1981 until May or June of 1982. At that time Dr. Sanchez "personally instructed [her] to destroy those claim forms from that day forward and not to put those forms in the patient files." "In May or June of 1982, the copies of those claim forms formerly kept and included in and comprising part of the patient files disappeared."

Arlene del Mazo, a Registered Nurse, and formerly head nurse at Crawford W. Long Hospital, is familiar with patients' files. After she took over Dr. Sanchez' files, she reviewed the files and compared them with insurance claims (private, Medicaid and Medicare), with information provided del Mazo by his patients and the insurers, and found "[i]n at least a majority of the files I reviewed, the patient files were grossly incomplete." Services paid for by insurers had no corresponding entry in the appropriate patient file. "Because of the lack of information in the patient files del Mazo was severely hampered in [his] efforts to treat patients, not knowing what tests or lab work or procedures had been performed previously and not knowing the results of those tests, lab work or procedures that had in fact been performed." Under regulations of Medicare and Medicaid, when Dr. Sanchez qualified as a provider of medical services, he agreed to make and maintain those records for at least three years. Dr. del Mazo, without "that historical information, or comparable information . . . would have no way of knowing what tests or lab work . . . had previously been performed for a patient, thereby increasing the risk that they would be duplicated and . . . unnecessary tests, lab work or procedures would be performed, thereby needlessly increasing the cost, and sometimes the discomfort and risk to life and well being, to a patient."

Immediately upon learning of the missing contents of the files and the apparent fraudulent billing practices of Dr. Sanchez, Dr. del Mazo, through his attorney on July 29, 1982, notified Dr. Sanchez he *rescinded* the contract for "the medical practice . . . I was buying from you" alleging Sanchez "seriously misrepresented certain material facts. . . ." He tendered to Sanchez "everything I thought I was purchasing from you." Dr. del Mazo's attorney notified Medicare and Medicaid of the possible fraud, and they investigated Dr. Sanchez' billing practices. An affidavit of Richard Rapa, Manager of Medical Administration for Prudential Life Insurance, notified Dr. Sanchez that he had been suspended from the Medicare program on August 12, 1982 pending investigation and the result of that investigation was that he had billed Medicare for procedures not performed, and for which he did not have the equipment, and his billings for 1981 and 1982 "result[ed] in an overpayment of $8,372.89" which was deducted from his escrow account.

Investigation by the Georgia Department of Medical Assistance,

which administers the Medicaid program in Georgia resulted in a finding that Dr. Sanchez had been overpaid $19,687.58. The investigators concluded that Dr. Sanchez "engaged in a pattern or an abusive scheme of fraud . . ." and that his patients' files "lacked proper documentation to support" his claims. As a Medicaid provider he was bound by regulations to maintain those records. The regional supervisor concluded that Dr. Sanchez "did not have the skill, training or equipment . . . to perform colonoscopies, sigmoidoscopies with flexible fiberoptic and endoscopies outside of a hospital. . . . Sanchez had none of that equipment in his office and did not have access to that equipment in a hospital." The Department also concluded that the B-12 and iron injections of Sanchez' patients were "entirely unwarranted in the majority of those cases" because they were given to patients whose "laboratory tests were normal. . . ."

The person who investigated Dr. Sanchez for the Medicaid program found that his overpayment resulted from "a pattern of fraud." In one instance, Dr. Sanchez treated a mother and billed the Department for $171, then submitted five additional billings for the same day for a total of $1,941 for treating the mother's five children and the mother. The investigator concluded that Dr. Sanchez did not treat any of the five children. Dr. Sanchez' medical assistant confirmed that he did not treat any of the children on the day he billed Medicaid for such services.

Dr. Sanchez filed this action, admitting he was "planning to leave the country" and "was negotiating with various parties for the sale of certain assets associated with [his] medical practice" and that Dr. del Mazo "agreed to purchase certain assets associated with Plaintiff's medical practice for the sum of $50,000.00. . . ." The agreement contained a clause which Sanchez alleged "purportedly [superceded] all prior contracts. . . ." Sanchez prayed for actual and punitive damages, costs and attorney fees. A second count asked for specific performance and Count 3 alleged a violation of privacy when Dr. del Mazo opened his mail to retrieve his checks before depositing them. Sanchez refused to return to Georgia to be deposed on the basis of the expense and the court agreed that defendant could submit written interrogatories to him. Sanchez submitted an affidavit in which he denied any intent to sell his medical practice but only sold his patient's files and agreed not to compete. He said he had fully performed the agreement and the files were delivered to del Mazo "containing all necessary and relevant information in them which was in my possession."

Dr. del Mazo answered and filed a counterclaim alleging fraud and deceit in inducing him to enter into the agreement to purchase Sanchez' medical practice, a failure of consideration in the failure of Sanchez to deliver the complete patients' files, and a third count al-

leged a violation of Chapter 14 of Title 16, Racketeer Influenced and Corrupt Organizations (RICO), through Sanchez' criminal and fraudulent activities in charging and collecting from Medicare and Medicaid for services never rendered, and that such "racketeering activity" injured Dr. del Mazo entitling him to triple damages. See OCGA § 16-14-6 (c).

The trial court granted Sanchez' "Motion for Summary Judgment" on "the Complaint and Counterclaim," but gave judgment for only $45,000 plus interest and costs. Dr. del Mazo brings this appeal. *Held*:

Appellants' defense and counterclaim are based on fraud and deceit in the inducement of the agreement. Appellee contends that the contract itself contains a provision that it represents the " 'entire agreement' . . . and, as this Court has held, when a contract contains such a clause, a fraud-in-the-inducement defense cannot be maintained unless it can be shown that the party claiming fraud lacked knowledge of the contents of the contract. *McGuire v. Winkler*, 167 Ga. App. 104 [306 SE2d 70] (1983); *Spires v. Relco, Inc.*, 165 Ga. App. 4 [299 SE2d 58] (1983)." Hence appellee argues parol evidence extraneous to the contract cannot be utilized to avoid the agreement, and this provision is a "waiver of any right to rely on oral misrepresentations . . . [and] expressly merged all previous representations into the four corners of the written agreement."

We do not agree. Our Code provides that "[f]raud renders contracts voidable at the election of the injured party." OCGA § 13-5-5. And, "[p]arol evidence shall be admissible to show that a writing either was originally void or subsequently became so." OCGA § 24-6-8. Further, "[f]raud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." OCGA § 51-6-1. "Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. . . . In all cases of deceit, knowledge of the falsehood constitutes an essential element of the tort. A fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood. . . ." OCGA § 51-6-2. Thus, if Sanchez made a wilful misrepresentation of the amount of his legitimate income for the preceding year, upon which Dr. del Mazo and his accountant said the purchase price was based, then there was evidence supporting an issue of fraud in the inducement. There was evidence that Dr. Sanchez had not performed all the services for which he billed Medicaid and Medicare, and that Medicaid and Medicare recouped respectively, $19,687.58 and $8,372.89, previously paid to Dr. Sanchez apparently included in the computation of the legitimate income of the medical practice, upon which the sale price was based. If such evidence is admissible, it raises an issue of

fraud in the inducement to vitiate the contract and of fraud and deceit as alleged in the counterclaim.

We must concede that *Spires v. Relco* and *McGuire v. Winkler,* supra, support appellee's contention that "a party cannot allege fraud in the inducement to avoid a written agreement containing a 'merger' or 'entire agreement' clause." *McGuire,* supra at 104. Further, *Spires* holds that " 'even assuming that the evidence would otherwise authorize a finding of fact that the agent's statement was an actionable misrepresentation, it is clear that under the terms of the "ENTIRE AGREEMENT" provision of the subsequently executed . . . agreement, appellants are "precluded from setting up fraud in the contract through such misrepresentations." ' " 165 Ga. App. at 6.

However, contrary to *Spires* and *McGuire,* supra, our earlier case law followed the statutes cited above. And, in *Brown v. Ragsdale Motor Co.,* 65 Ga. App. 727, 729 (16 SE2d 176), where a material misrepresentation was made, we quoted the foregoing statute that fraud, by which consent of a party is obtained to a contract of sale renders that sale voidable at the election of the injured party. Code Ann. § 20-502, now OCGA § 13-5-5. *"Fraud ordinarily gives the injured party the right* either *to rescind* the contract, *or,* by *affirm*ing the same, to claim damages." (Emphasis supplied.) *Brown,* supra at 730.

The critical question as to which statute should be applied is based upon which course of action is selected by the defrauded party. If the party elects to rescind the contract as voidable, he is not bound by the provisions of the rescinded contract. *Brown,* supra at 730. If the defrauded party elects to affirm the contract and sue for damages for fraud and deceit he is bound by the contract provisions. Id. This distinction was made clear in *Eastern Motor Co. v. Lavender,* 69 Ga. App. 48 (1) (24 SE2d 840), wherein a buyer sought to repudiate a contract containing a merger of prior oral promises into a written contract by a claim of fraud in the procurement. "[D]efendant contends that on account of said clause in the written contract parol evidence was inadmissible to contradict or vary this provision of the contract. The defendant's contention would be correct if the jury had found that the written contract was valid. However, the plaintiff contended that he had repudiated the contract on the ground of actual fraud consisting of material and fraudulent misrepresentations which induced him to enter into the agreement." Id. at 51. We held that "[t]he plaintiff was not seeking to recover on the contract, for he had rescinded it, and after such rescission he had no contract on which he could sue." Id. "The written contract [being rescinded] . . . stands as if it had never been made, and none of its terms or conditions are binding . . . for in the eyes of the law the written contract is nothing when it has been voided by a rescission on account of actual fraud; and parol evidence is admissible to show that the writing was either

originally void or has subsequently become so. Code § 38-503 [now OCGA § 24-6-8]." Id. at 52.

In a similar action, in *City Dodge v. Gardner*, 130 Ga. App. 502 (203 SE2d 729), where a buyer rescinded a contract of sale for a car on the grounds of fraud and deceit, we held: " 'Where the purchaser . . . has been injured by the false and fraudulent representations of the seller as to the subject matter thereof, he ordinarily has an election whether to rescind the contract, return the article, and sue in tort for fraud and deceit, or whether to affirm the contract, retain the article, and seek demages [sic] resulting from the fraudulent misrepresentation.' " Id. at 503. On certiorari, the Supreme Court affirmed, and decided the issue of whether the language of a merger clause that " 'no other agreement, promise, or understanding of any kind — pertaining to this purchase will be recognized,' was legally effective to prevent the buyer from claiming that he relied on the seller's misrepresentation," i.e., fraud in the inducement. *City Dodge v. Gardner*, 232 Ga. 766, 767 (208 SE2d 794). The Supreme Court sanctioned the choice of the defrauded buyer who had been induced to enter a contract by fraud and deceit to affirm and sue in contract for breach, or rescind and sue in tort for fraud and deceit. Id. at 768. On the issue of whether the merger or disclaimer provision prevents evidence of prior parol deception when the party attempts to rescind the contract, they held "the better view is that the question of reliance on the alleged fraudulent misrepresentation in tort cases cannot be determined by the provisions of the contract sought to be rescinded but must be determined as a question of fact by the jury. It is inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract. If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties. *In this case, parol evidence of the alleged misrepresentation was admissible on the question of fraud and deceit.* As the antecedent fraud was proven to the satisfaction of the jury, it vitiated the contract." (Emphasis supplied.) Id. at 770.

In another contract issue involving a claim of fraud in the inducement and a clause in the contract that the entire contract is set forth in the document and that the buyer cannot rely upon prior representations, the Court held that "we do not agree that this particular integration clause can be regarded as a relinquishment or waiver of the purchaser's rights. . . . We consider this clause as merely having evidentiary value on the question of whether representations were made to the purchaser inducing [the sale] other than those contained in the prospectus. This provision in the contract states there were no such representations but the purchaser now says there were representa-

tions outside the prospectus which induced the purchase. *This creates an issue of fact that cannot be resolved as a matter of law.* We also reject the seller's contention that the clause . . . estops the purchaser from raising any alleged oral misrepresentations." (Emphasis supplied.) *Meason v. Gilbert,* 236 Ga. 862, 863-864 (226 SE2d 49). If there were any doubts remaining as to whether a "merger" or "integration" clause in the signed contract of sale precluded evidence of oral representations as to a claim of fraud in the procurement, they were dispelled in *Brown v. Techdata Corp.,* 238 Ga. 622, 627 (234 SE2d 787): "This court's decision in *City Dodge v. Gardner,* 232 Ga. 766 . . . laid to rest the argument that a merger or integration clause contained in a contract being attacked for fraud precludes the introduction of parol evidence to show that the contract was indeed fraudulently induced."

Our more recent cases have also followed our earlier cases rather than *McGuire* and *Spires,* supra. In *Potomac Leasing Co. v. Thrasher,* 181 Ga. App. 883 (354 SE2d 210), we reaffirmed our earlier authorities by emphasizing that "two actions are equally available to one who was fraudulently induced by misrepresentations into entering a contract. The defrauded party can 'affirm the contract and sue in contract for breach or he [can] seek to rescind the contract and sue in tort for alleged fraud and deceit.' [Cit.] However, depending upon which of the two actions is ultimately pursued, the presence of a merger clause in the underlying contract may be determinative as to the successful outcome. If the defrauded party has not rescinded but has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. [Cit.] If, on the other hand, he does rescind the contract, the merger clause will not prevent his recovery under a tort theory. '[T]he question of reliance on the alleged fraudulent misrepresentation in tort cases cannot be determined by the provisions of the contract sought to be rescinded but must be determined as a question of fact by the jury.' [Cit.] . . . 'The rule that parol agreements shall not be received to change or add to the terms of a written contract does not apply where the alleged contract was procured by fraud.' " Id. at 886-887.

In the instant appeal, the buyer offered parol evidence he was induced to enter the agreement through fraudulent misrepresentation of the legitimate income of the medical practice upon which the purchase price was based. Parol evidence showing fraud in the inducement is admissible even though the written contract says the entire agreement of the parties is contained therein. *Brown,* supra; *City Dodge,* supra. This evidence is sufficient to raise an issue, thereby precluding summary judgment on the issue of fraud. *Gibbs v. Jim Wilson Chevrolet Co.,* 161 Ga. App. 171, 172 (288 SE2d 264). " 'Questions of fraud, the truth and materiality of representations made by a

[seller], and whether the [buyer] could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury.'" *Thomson v. Walter,* 160 Ga. App. 542, 543 (287 SE2d 562). The evidence in the case at the bar is not "plain and indisputable."

In the event of a conflict between decisions of this court (*McGuire* and *Spires,* supra) and the Supreme Court (*Brown, Meason,* and *City Dodge,* supra), we are bound to follow decisions of the Supreme Court (Art. VI, Sec. VI, Par. VI, 1983 Const. of Ga.), and to the extent that *McGuire* and *Spires* are in conflict with *Brown, Meason* and *City Dodge,* they no longer will be followed. The trial court erred in granting summary judgment to appellee when there was evidence of fraud in the inducement, rescission of the contract, and tender to the seller of the property purchased. Further, since there was evidence of rescission and tender, and the buyer had counterclaimed for fraud and deceit, it was error for the trial court to grant summary judgment for appellee on the counterclaim. We specifically do not reach any issue regarding a violation of the Georgia "little RICO act," but note only that "racketeering activity" is limited to designated Articles of the Georgia Code, and "fraud" is not one of those listed. See OCGA § 16-14-3 (3) (A). "Theft" of the type listed as "racketeering activity," "Article 1 of Chapter 8," is "theft by taking." However, "theft by deception" is proscribed by OCGA § 16-8-3.

*Judgment reversed. McMurray, P. J., Carley, Pope, and Benham, JJ., concur. Deen, P. J., Banke, P. J., and Sognier, J., concur specially. Beasley, J., concurs in judgment only.*

## ADDENDUM.

With reference to the special concurrence, we wish to state that no attempt is made to overrule *McGuire* or *Spires,* supra. Our holding is that "to the extent that [they] are in conflict with *Brown, Meason* and *City Dodge,* they no longer will be followed." The reason for this limitation is as follows: In contracts which include a "merger" or "entire agreement" clause, the admissibility of parol evidence on a claim of fraud in the inducement is controlled by the type of action followed by the purchaser/plaintiff. *Potomac Leasing Co. v. Thrasher,* supra at 886. If the purchaser/plaintiff "rescinds" the contract, "parol evidence of the alleged misrepresentation was admissible on the question of fraud and deceit." *City Dodge v. Gardner,* 232 Ga. 766, 770, supra; accord *Brown v. Techdata Corp.,* supra at 627. If the purchaser/plaintiff "affirms" the contract, "he is relegated to a recovery in contract and the merger [or "entire agreement"] clause will prevent" reliance upon a claim of fraud in the inducement. *Thrasher,* supra at 886. Because *McGuire* and *Spires* forbid the use of parol

evidence in the support of a claim of fraud in the inducement, regardless of whether the plaintiff has rescinded or is affirming the contract, it is misleading and incorrect if applied to an action where the purchaser has rescinded the contract. It is a correct statement of law when applied to contracts affirmed by the purchaser. "[T]o the extent that *McGuire* and *Spires* are in conflict with *Brown, Meason,* and *City Dodge,* they no longer will be followed" because this court is bound by decisions of the Supreme Court. Art. VI, Sec. VI, Par. VI, 1983 Ga. Const.

DEEN, Presiding Judge, concurring specially.

While fully concurring in the result reached in the majority opinion, I do not feel that it is necessary to overrule *Spires v. Relco,* 165 Ga. App. 4 (299 SE2d 58) (1983); and *McGuire v. Winkler,* 167 Ga. App. 104 (306 SE2d 70) (1983), as that line of cases is readily distinguishable from those relied upon in the majority opinion. In *Spires* there was a failure to pay under a lease agreement, and appellant contended that certain promises of service, training, etc., were offered as an inducement to enter into the contract. *McGuire* involved a contract of sale to purchase welding equipment. The purchaser claimed that he was fraudulently induced to enter into the contract by an oral promise to sell him the business and its goodwill. The oral promise was not written into the contract. Both cases were correctly decided by this court, as the oral promises were precluded by a merger clause in the contract. In *Charter Med. Mgt. Co. v. Ware Manor,* 159 Ga. App. 378, 383 (283 SE2d 330) (1981), Judge Carley, writing the majority opinion, quoted the rule from *Wilkinson v. Walker,* 143 Ga. App. 838, 839 (240 SE2d 210) (1977), which states: "Fraud cannot consist of *mere broken promises, unfulfilled predictions or erroneous conjecture as to future events.*" (Emphasis supplied.) Neither can fraud consist of oral misrepresentations which could have been ascertained by *careful physical examination or reasonable diligence to discover* the truthfulness of the allegations. See *Alpha Kappa Psi Bldg. Corp. v. Kennedy,* 90 Ga. App. 587 (83 SE2d 580) (1954), where the purchaser could have discovered by diligence the lake. depth at the boundary line to be 11 to 12 feet rather than two feet as orally represented. He could also have had the lake surveyed and discovered it to be 7-½ acres rather than 10 acres. See also *Levine v. Peachtree-Twin Towers Co.,* 161 Ga. App. 103 (289 SE2d 306) (1982) (oral representation that storeroom lay behind locked door when it was actually a very noisy elevator control room).

The cases relied upon by the majority opinion, as in the instant case under review, all involve actual fraudulent concealment of present or past facts which were not readily discernible through the use of reasonable diligence. In *Brown v. Ragsdale Mtr. Co.,* 65 Ga. App.

of reasonable diligence. In *Brown v. Ragsdale Mtr. Co.*, 65 Ga. App. 727 (16 SE2d 176) (1941), a speedometer was rolled back and the car represented to the purchaser as new. A similar situation occurred in *Eastern Motor Co. v. Lavender*, 69 Ga. App. 48 (24 SE2d 840) (1943), and *City Dodge v. Gardner*, 130 Ga. App. 502 (203 SE2d 729) (1974); 232 Ga. 766 (208 SE2d 794) (1974). In both of those cases representations were made that the automobile the buyer wanted to purchase had never been wrecked or damaged. *Brown v. Techdata Corp.*, 238 Ga. 622 (234 SE2d 787) (1977), was similar in that it involved certain nondisclosures in the sale of business assets. While *Meason v. Gilbert*, 236 Ga. 862 (226 SE2d 49) (1976), is similar in that it concerns representations made to a purchaser of securities and the contract contained a merger clause, it also dealt with other statutory provisions pertaining to the sale of securities. The rule applied to these cases is long-standing: If there is actual fraud, the buyer is not affected by any of the provisions of the contract because the fraud rescinds the contract. In *City Dodge*, 232 Ga. 766, the court found that reliance upon the misrepresentation is a jury question, and, if the contract is invalid because of fraud, the disclaimer provision is ineffectual, as there is no contract between the parties. This line of cases therefore presents a different situation from those in the cases sought to be overruled. In the latter, there can be no finding of fraud where there are only future promises which are not incorporated into the contract, or where the erroneous nature of the representation is readily discoverable. The two differing lines of cases need to be preserved as standing for two distinct principles and positions.

I am authorized to state that Presiding Judge Banke and Judge Sognier join in this special concurrence.

DECIDED FEBRUARY 4, 1988 —
REHEARING DENIED MARCH 1, 1988 —

*Randall A. Constantine*, for appellants.
*John P. MacNaughton, Jane C. Barwick*, for appellee.