**GE LIFE AND ANNUITY ASSURANCE COMPANY,**
Plaintiff

v.

**William BARBOUR, et al.**
**Defendants/Counterclaim**
**Plaintiffs**

No. 5:01–CV–81–1(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 7, 2002.

Robert C. Norman, Jr., Howard Jerome Strickland, Macon, GA, for Plaintiffs.

Gary C. Christy, Cordele, GA, Stanley L. Merritt, Jr., Jason Lance Crawford, Columbus, GA, Hardy Gregory, Jr., Preyesh K. Maniklal, Cordele, Gary O. Bruce, Columbus, GA, Kice H. Stone, Macon, GA, Jonathan H. Waller, Birmingham, AL, for Defendants.

## ORDER

OWENS, District Judge.

This case filed pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, is before the Court on the following motions:

1. Defendants' Motion to Dismiss/Motion for Summary Judgment [Tab 8 and 45];

2. Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [Tab 36];

3. Plaintiff's Motion to Strike Plaintiff McBride and Counterclaim Plaintiff's Statement [Tab 56]; and

4. Plaintiff's Motion to Strike the Affidavits and Reports of Purported Expert Tim C. Ryles [Tab 60].

Because the Motion to Dismiss has been converted into a Motion for Summary Judgment, it will be analyzed under Federal Rule of Civil Procedure 56 and applicable case law. Defendants requested the Court to incorporate into this case certain portions of the briefs and exhibits filed in the related *McBride* case. *See* Tab 45. For the areas in which those materials are applicable to the Defendants in this case, they are adopted and incorporated.

## I. Factual and Procedural History

In 1982, GE issued William Barbour three life insurance policies with $150,000 coverage on William's life and $25,000 coverage on each of his two children Crystal and Shanon [1]. *See* Defs'. Resp. to Stmt. of

---

1. William Barbour contends he purchased four other policies from GE from 1965 through 1967. These policies and two others were cashed in to help fund the policies at issue in this case. *See* Aff. of W. Barbour at Tab 53; Defs.' Countercl. at Tab 38, Ex. 2.

Material Facts Not in Dispute, Tab 44. In 1982, Sandra Barbour, William's wife, also purchased a $100,000 policy from GE on her life. *Id.* William Barbour contends they purchased the policies under the assurances they would pay a fixed premium until each insured family member reached age 65. *Id.* They were allegedly told the policies would accumulate enough interest to sustain themselves until that time. *Id.* at ¶ 25, 26.

In 1988, changes were made to the policies. The Barbours contend they believed they were merely changing the ownership of the policies to make Sandra the owner. GE contends they purchased new policies. *Id.* at 35–44, 61 [2]. William Barbour contends he was assured in 1988 the cash value that had built up in the 1982 policies would sustain the 1988 policies alleviating the need for future premium payments.[3] The William Barbour policy issued in 1988 listed a SINGLE PAYMENT premium of $8,600. *See* Tab 38, Ex. 21. Sandra Barbour's 1988 policy listed a SINGLE PAYMENT premium of $4,457.07. *Id.* at Ex. 22. Shanon and Crystal Barbour's 1988 policies listed SINGLE PAYMENT premiums of $1,300. *Id.* at Ex. 23, 24.

With the exception of $100 paid into each of children's policies in 1999, the Barbours have paid no other premiums on any of the policies. The Barbours contend this was because the agent, Tom Wagoner, assured Sandra in the later part of 1987 or the first part of 1988 they could stop paying the annual premiums because the policies had enough money in them to sustain themselves. *See* Defs'. Resp. to Stmt. of Material Facts Not in Dispute, Tab 44 at ¶ 63. In 1998, Tom Wagoner visited Sandra Barbour and advised the Barbours to consider putting some more money into the policies. The Barbours did not do so

at that time. In January of 1999, the Barbours received a letter from GE recommending a lump sum payment should be made on Sandra's and the children's policies. It was at that time the Barbours put $100 into each of the children's policies. In February of 1999, the Barbours received another recommendation to pay yet another lump sum into the policies but the Barbours have refused to do so. *See* Aff. of W. Barbour at Tab 53.

The evidence shows that GE marketed these policies to consumers like Defendants who had existing policies the cash value of which could be used to purchase the new policy. *See* Tab 47. A fee was taken out of the cash value in existing policies and was transferred into the new policy. Defendants contend this fee was never disclosed to them or to other consumers. Defendants were told the interest on their policies would fund the 1982 policies after each insured reached age 65 and that interest accumulation would sustain the 1988 policies based on the cash value at that time. If interest rates fell, the cash value of the policies would diminish but this was not disclosed in the policies. The agents allegedly advertised the policy as an investment or savings instrument which would pay interest to the account from which insurance premiums would be paid. Defendants contend that the effect a drop in interest rates would have on the policy was never explained to them. They also contend they never received a buyer's manual that more fully explains the policy. *See* Defs. Resp. to Stmt. of Material Facts Not in Dispute, Tab 44 at ¶ 17.

The administration of the policy is best explained by GE's designated corporate representative, Bruce Booker. Booker is

---

2. *See also* Depo. of W. Barbour at Tab 38, Ex. 7, 82: 4–24, 164–167; Depo. of Sandra Barbor at Tab 38, Ex. 8, 23:11–25.

3. *See* Aff. of W. Barbour at Tab 53; Defs.' Countercl. at Tab 38, Ex. 2.

the Vice President for Business Development for GE. *See* Depo. of Booker at 11:19–20, Tab 47, Ex. 6. Part of Booker's responsibilities includes product design, actuarial projections and pricing projections. *Id.* at 13–16. In his deposition,[4] Booker explained how the company priced the policies. He explained the company made projections on how interest rates were going to affect the cost of the policies and thus the cash value of the policies. *Id.* at 38–59. The cash value is almost entirely dependent on interest rates remaining stable for 20 to 30 years. The second set of Barbour policies, or the "replacement set" issued in 1988, were to remain in force as follows: (1) Shanon's until 2066—78 years; (2) Crystal's until 2062—74 years; (3) Sandra's until 2040—52 years and (4) William's until 2038—50 years. *See* Aff. of B. Norman at Tab 38, Ex. 21–24; Compl. at Ex. E–H. Mr. Booker testified that "I don't believe there is ever any reason or requirement to assume that either current interest rates or credited interest rates would remain at any particular level for 30 years." *See* Depo. of B. Brooker at 81:17–20 at Tab 47, Ex. 6. In fact, Booker stated, "I believe that the actuarial principles would—would require that the actuary not make assumptions that depend on the interest rate being unchanging over a long period of time." *Id.* at 98:6–9. Although Booker was testifying with McBride's policy used as an example, his testimony is applicable in this case because a similar policy is in dispute. Booker stated that, in the unlikely event the interest rate remained at or around that rate, McBride's policy would still lapse in year 13 [1999] if he continued to pay only the agreed upon premium of $151. *Id.* at 100:4–21. In fact, Booker clarified the "initial planned premium, periodic premium, would not be sufficient to have the policy last until ... 2028." *Id.* at 100:22–24. Accordingly,

"the monthly premium would have to increase to maintain the policy in force." *Id.* at 101:8–11. Likewise, this testimony shows the Barbour policies would have lapsed much sooner than the dates stated therein. Notably, from a review of the record, this information is found nowhere in the policy or any accompanying material provided to the Barbours at the time they purchased the policies.

October 12, 1999, Defendants William and Sandra Barbour submitted affidavits in another case alleging they had been defrauded when they purchased the insurance policies. *See* Compl. at ¶ 31. On November 17, 2000 counsel for GE was notified of the Barbour's intent to pursue claims based on the policies. Based on the foregoing, Plaintiff filed the instant Declaratory Judgment action and asked the Court to find the contract valid and enforceable as written. Defendants filed a Counterclaim alleging violations of Georgia's RICO Act and claims for fraud and deceit based on the confusing and misleading nature of how the policies were administered and valued. Defendants contend the policy language as written is not readily understandable and the policy was not administered as the agents represented during the sale of the policy.

## II. Motions to Strike

GE moved to strike a document filed by the Barbours and the other Counterclaim Plaintiff's in the five related cases. The document is entitled "Plaintiff McBride and Counterclaim Plaintiff's Statement." *See* Tab 48. It is essentially a response by the Barbours and the other Counterclaim Plaintiffs to GE's statement of material facts not in dispute filed in support of GE's summary judgment motion. GE contends the Statement is neither contemplated nor required by Rule 56. The Barbours con-

---

4. Attached as Exhibit 6 to the Collective Notice of Filing Evidentiary Material at Tab 47.

tend they filed the Statement only in an abundance of caution to ensure full compliance with Rule 56. The Barbours have stipulated to withdraw any portion of the Statement not in compliance with the Rules. Further, they indicated they did not anticipate any response from GE to the Statement. The parties have had ample opportunity to address the issues contained in the Statement during the January 16, 2002 hearing and in the numerous briefs that have been filed. Because all the information contained therein has already been addressed in some form, there is no harm or prejudice in filing the same. More important, the Court has addressed the five related cases collectively for the past year. Therefore, it was not inappropriate for the Barbours and the other Counterclaim Plaintiff's to file a joint statement of material facts. Accordingly, the **Motion to Strike the "Plaintiff McBride and Counterclaim Plaintiff's Statement" is hereby DENIED.**

GE also moved to strike the Affidavit and Report of Purported Expert Tim C. Ryles.[5] GE contends the purported expert opinions do not satisfy the standards set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court adopts the reasoning of another judge of this Court that after a full hearing on the matter addressed the admissibility of this same expert's opinion. *See Tidwell v. Allstate Ins. Co.*, No. 1:96–CV–189–1 (M.D.Ga. Apr. 4, 2000)[6]. In *Tidwell*, the court held, "Dr. Ryles has an extensive basis upon which to base his testimony and hence Ryles' testimony regarding the standard of care in the industry ... has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at *4(citing *Kumho Tire v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). As recognized in *Tidwell*, Ryles' opinion is "based more on his knowledge and experience rather than on scientific matters which were the subject of *Daubert*." *Id.* Therefore, the reports and affidavits of Ryles are admitted.

The opinions are not admitted to decide the ultimate, dispositive issues in this case—the actual legal interpretation of the contracts. Rather, Ryles' expert opinion will be used to explain the complex nature of the contracts and the terms and concepts contained therein. Because that information is relevant to the issues before the Court, appears to be in compliance with Federal Rule of Civil Procedure 702 and GE has been able to respond to the Affidavit, it will not be struck from the record. Accordingly, the **Motions to Strike the Opinions, Affidavits and other filings pertaining to Expert Tim Ryles are DENIED** and GE's request for further oral argument on this issue is DENIED.

### III. Summary Judgment Standard

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Moreover, the moving party has the burden of meeting this exacting standard." *Brooks v. Blue Cross*

---

5. Attached as Exhibits 11 and 12 to Tab 47, the "Collective Notice of Filing Evidentiary Materials and Submission of Exhibits In Opposition to Life of Virginia's Motions for Summary Judgment." The Report is attached to Tab 57 as "Defendant's Disclosure of Expert Testimony."

6. Attached as Exhibit A to Defendant's Opposition to Plaintiff's Motion to Strike, Tab 64. The hearing transcript is attached as Exhibit A to Tab 65.

& *Blue Shield,* 116 F.3d 1364, 1369 (11th Cir.1997) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Applying this standard, the Eleventh Circuit explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever.

*Id.* (internal citations omitted). In this case, summary judgment is not appropriate if the parties agree on the basic facts—there were life insurance policies issued to the Barbours by GE in 1982 and 1988—but disagree about the inferences that should be drawn from these facts—whether the contracts are fraudulently vague, ambiguous or misleading and whether GE committed fraud when its agents failed to disclose material information about the contracts.

## IV. Statutes of Limitation

### A. Fraud Claims

■ The statute of limitations for fraud claims in Georgia is four years. O.C.G.A. § 9–3–31. Actual fraud tolls the statute of limitations where it is the gravamen of the action before the court. *Shipman v. Horizon Corp.,* 245 Ga. 808, 267 S.E.2d 244, 246 (1980). "Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." *Id.* at 246. *See also Coffee v. General Motors Acceptance Corp.,* 30 F.Supp.2d 1376, 1381 (S.D.Ga.1998)(citing *Shipman* )(actual fraud where defendant intentionally deceives by false representation or by concealment of a fact which has the effect of barring and deterring plaintiff from his action). Moreover, where the gravamen of an action is actual fraud, failure to exercise reasonable diligence to discover the fraud may be excused if a relationship of trust and confidence exists between the parties. *Shipman,* 267 S.E.2d at 246. In such situations, this is a mixed question of law and fact that is more appropriately submitted to a jury. *Therrell v. Georgia Marble Holdings Corp.,* 960 F.2d 1555 (11th Cir.1992).

■ The Barbours contend there was actual fraud in the procurement and replacement of the life insurance policies in question. The statute of limitations would not have begun to run in this case until they discovered the initial premiums stated in the policies would not in fact sustain the policies in the future. Alternatively, the limitations period began to run when they could have reasonably discovered that

information. The Barbours could not have discovered the alleged fraud in this case until January 1999 when they received notification the policies had not actually sustained themselves as allegedly promised. Until that time, the Barbours could not have even suspected the alleged fraud committed by GE years earlier. Because the fraud was not discoverable until January of 1999, the statute of limitations would not have run until January of 2003. Since the Counterclaim was filed on July 25, 2001, it was filed within the limitations period.

### B. Georgia RICO Claims

The statute of limitations for Georgia RICO claims is five years. O.C.G.A. § 16–14–8. The Georgia Code provides that "a criminal or civil action or proceeding under this chapter may be commenced up until five years after the conduct in violation of a provision of this chapter terminates or the cause of action accrues." *Id.* Because Defendants created a material issue of fact regarding the statute of limitation on their fraud claims, there remains a question of fact on the issue of whether Georgia's RICO statute of limitation is applicable.

### V. Substantive Claims

### A. Declaratory Judgment Act

■■■ GE originally filed its Complaint seeking a declaratory judgment that the policy is the complete agreement between the parties and that nothing in the policy guaranteed the policy would always remain in force or that premiums would never increase. The Declaratory Judgment Act is found at 28 U.S.C. § 2201 *et seq.* There is support in prior precedent that a suit pursuant to this statute is the appropriate method to determine the validity of a contract. *State Farm v. Bates,* 542 F.Supp. 807 (N.D.Ga.1982) (insurance company sought determination of its liabilities under

various insurance contracts); *see also Sears, Roebuck & Co. v. American Mut. Liability Ins. Co.,* 372 F.2d 435 (7th Cir. 1967) (the Act affords relief from uncertainty and insecurity with respect to legal relations); *Hardware Mut. Casualty Co. v. Schantz,* 178 F.2d 779 (5th Cir.1949) (Act's purpose is to prevent suits); *Friedman v. Geller,* 925 F.Supp. 611(E.D.Wis.1996) (threat of suit makes a justiciable controversy). In *Bates,* the court held, "Federal courts long have held that an insurance company seeking determination of its liabilities under an insurance contract could utilize the Declaratory Judgment Act for such a purpose." *Bates,* 542 F.Supp. at 817. To proceed with a Declaratory Judgment Act claim, there must be (1) an actual issue in controversy as opposed to one that is hypothetical or contrived, (2) the case must not be the medium for securing an advisory opinion, (3) the matter must be definite and concrete, (4) the parties' positions must be defined and adversarial and (5) the issues must be susceptible to judicial determination. *Id.* All of these elements are met in the case at bar.

This case involves four life insurance policies issued in 1982 and 1988. On October 12, 1999, Defendants William and Sandra Barbour submitted affidavits in another case alleging they had been defrauded when they purchased their insurance policies. On November 17, 2000, counsel for GE was notified of the Barbour's intent to pursue claims based on the policies. Because there are questions of fact regarding the substantive claims in this case as more thoroughly addressed below, there are actual issues in controversy sufficient to proceed under the Declaratory Judgment Act. Accordingly, Defendants' **Motion for Summary Judgment** as to this Court's lack of jurisdiction to consider the Declaratory Judgment action is **DENIED.**

## B. Fraud and Concealment Claim

### 1. Prima Facie Case of Fraud

 To state a claim for fraudulent misrepresentation under Georgia law a plaintiff must prove five essential elements: (1) that the defendant made representations; (2) that defendant knew the representations were false; (3) that these representations were made intentionally and for the purpose of deceiving the plaintiff; (4) that plaintiff reasonably relied on these representations; and (5) that as a proximate result of the misrepresentations plaintiff incurred damages. *See* O.C.G.A. § 23-2-52; *Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir.1997). "Georgia law further provides that 'suppression of a material fact which a party is under an obligation to communicate constitutes fraud.'" *Id.* (citations omitted).

 "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." *Id.* "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *Id.* "In cases where Georgia courts have found the existence of a confidential relationship in business, the parties have had either a history of business dealings with each other or the kind of relationship that is not arms-length, such as a partnership or principal and agent." *Id.* at 1168. "However, Georgia courts have recognized that even though the parties were acquainted as friends or business associates prior to a business transaction, a confidential relationship is not automatically established." *Id.* The "existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue." *Id.* "Where one person sustains towards another a relation of trust and confidence, his silence when he should speak or his failure to disclose what he ought to disclose constitutes fraud in law just as do actual affirmative false representations." *Tigner v. Shearson–Lehman Hutton, Inc.*, 201 Ga.App. 713, 411 S.E.2d 800, 802 (1991) (citations omitted). O.C.G.A. § 23-2-58 defines a confidential relationship as one "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another." In *Tigner*, the court held there was a confidential relationship when a broker undertook an obligation to manage the plaintiff's financial investments. *See also Stewart v. Boykin*, 165 Ga.App. 868, 303 S.E.2d 50 (1983) (where an insurance agent was not the employee of the insurance company, the existence of a fiduciary relationship between the agent and the insured was a question for the jury); *Dominick*, 809 F.2d at 1570–71(duty of fair dealing and to disclose material facts where insured in inferior bargaining position to agent). Based on this guidance, the issue of whether there was a duty to disclose the material terms and conditions of the policy to the Barbours is more appropriately a question for the jury.

### 2. Affirmance v. Rescission

 When a party seeks to prove he was fraudulently induced by misrepresentations into entering a contract, "he can affirm the contract and sue for breach or seek to rescind and sue in tort for fraud and deceit." *Carpenter v. Curtis*, 196 Ga. App. 234, 395 S.E.2d 653, 655 (1990) (citations omitted). "Affirmance of the contract by the defrauded party does not necessarily deprive him of the right to sue for damages for fraud, as the right to affirm and the right to fraud damages coexist. However, he must do nothing to waive the fraud." *Id.* Waiver may be accomplished by actually affirming the contract, by waiting too long to bring an action on the contract and thus constructively affirming the contract or in some instances by a merger clause that is not itself voidable because of fraud. *See generally Id.* A

merger clause can be defeated under certain circumstances such as where there is evidence the transaction in question was not an arm's length transaction between professionals or there was a duty to disclose between the parties. *Kobatake v. E.I. DuPont De Nemours and Co. et al.,* 162 F.3d 619, 626 (11th Cir.1998) (citation omitted). If rescission of the contract is no longer a viable option, a plaintiff must proceed under the contract and seek any damages to which he is entitled. *Carpenter,* 395 S.E.2d at 656.

 One case specifically addressing insurance policies stated "courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled." *Benevento v. Life USA Holding, Inc.,* 61 F.Supp.2d 407, 418 (E.D.Pa.1999)(annuity case where insureds claimed fraud in the sale of the policy). "Regardless of the ambiguity (or lack thereof) inherent in a given set of insurance documents (whether they be applications, conditional receipts, rider, policies, etc.), the public has a right to expect that they will receive something of comparable value in return for the premium paid." *Id.* (citations omitted). "Thus, where an individual applies and pays for specific insurance coverage, the insurer may not unilaterally change the coverage or issue a policy differing from what the insured requested and paid for without affirmatively showing that the insured was notified or, and understood the change, regardless of whether the insured read the policy." *Id.* (citation omitted). *See also Greenberg v. Life Insurance Company of Virginia,* 177 F.3d 507 (6th Cir.1999)(interpreting a similar contract pursuant to similar Ohio law

and finding the contract sufficiently ambiguous, vague and misleading to reverse trial court's dismissal for failure to state a claim).

The most pertinent statement of Georgia law is that: "Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the articles which the other party by the exercise of ordinary prudence and caution could not discover." *Rivers v. BMW of North America, Inc.,* 214 Ga.App. 880, 449 S.E.2d 337 (1994).[7] This statement of law is taken from a jury instruction in fraud cases involving vehicles sold to consumers who were misled into purchasing a product that was not as represented by the seller. This principle is also applicable where insureds have been fraudulently induced into parting with thousands of dollars to purchase a life insurance policy that was materially different from what was represented by the company. Based on this precedent, Defendants are not estopped from asserting both fraud and breach of contract in their Counterclaim.

## 3. Parol Evidence Rule and Related Issues

 In support of the Barbours' claim that they were fraudulently induced into signing and maintaining the policies in question, they filed various documents, affidavits and briefs containing information that GE contends violates the Parol Evidence Rule. As a matter of general contract construction, a contract containing a "merger" clause indicates a complete agreement between the parties that may

---

**7.** The Court notes that *Life Ins. Co. of Virginia v. Conley* relied upon by GE does not appear to be the current state of the law in Georgia regarding fraudulent inducement to purchase a life insurance contract. *Life Ins. Co. of Virginia v. Conley,* 181 Ga.App. 152, 351

S.E.2d 498 (1986). Although *Conley* interpreted a similar contract with GE, subsequent case law indicates a different approach than the one taken in *Conley* that would result in a complete miscarriage of justice to the insured.

not be contradicted by extraneous material. However, in the case of fraud, extraneous material may sometimes be admitted. "False and fraudulent representations as to an existing fact which induced the signing of a sales contract give the purchaser the right to rescind the contract." *Crews v. Cisco Bros. Ford–Mercury, Inc.*, 201 Ga.App. 589, 411 S.E.2d 518, 519 (1991) (citations omitted)(concerned buyers of used vehicles sued dealer for fraud after learning the vehicles had been previously wrecked). "One who seeks rescission of a contract for fraud must restore or offer to restore the consideration received thereunder, as a condition precedent to bringing the action." *Id.* (citation omitted). "[H]owever, restoration by the purchaser is not an absolute rule, and does not require that the defrauding part be placed in exact status quo, but only that he be placed substantially in his original position and that the party rescinding derives no unconscionable advantage from the rescission." *Id.* (citations omitted). The defrauded party need not offer to restore where the defrauding party has made restoration impossible or when to do so would be unreasonable. *Id.* (citations omitted). This rule can only be applied when it is equitable. *Id.* at 520. It "was not meant to give the defrauding party an advantage at the expense of the defrauded purchaser." *Id.*

█ With this general guidance in mind, the analysis can proceed to the underlying issues. As to the merger clause, "questions of reliance on the alleged fraudulent misrepresentation in tort cases cannot be determined by the provisions of the contract sought to be rescinded but must be determined as a question of fact for the jury." *Id.* (citing *City Dodge v. Gardner*, 232 Ga. 766, 208 S.E.2d 794 (1974)). It is "inconsistent to apply a disclaimer provision of a contract in a tort action brought to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract." *Id.* "If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties." *Id.* at 520–21 (citation omitted). "Parol evidence showing fraud in the inducement is admissible even though the written contract says the entire agreement of the parties is contained therein." *del Mazo v. Sanchez*, 186 Ga.App. 120, 366 S.E.2d 333, 337 (1988). Evidence of fraudulent inducement is sufficient to raise an issue thereby precluding summary judgment on the issue of fraud. *Id.* "Questions of fraud, the truth and materiality of representations made by a seller, and whether the buyer could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury." *Id.* (citations omitted).

The Barbours assert claims for fraud and concealment based on insurance policies. They contend the policies omitted material information the lack of which was the direct and proximate cause of their damages. The Barbours contend there were misrepresentations regarding the duration of coverage, the type of coverage, the duration and type of premiums and other important information vital to a complete understanding of the policy. This was all part of an allegedly fraudulent scheme to obtain money from the Defendants by means of false pretenses, misrepresentations and promises with the intent to deprive them of that money and property.

The policies provided for an interest rate of 7.4%. The maturity dates of the policies were between 50 and 78 years after the issue date. Although they are extremely vague, ambiguous and misleading, the pertinent clauses in the policies indicate no other premiums would be needed beyond the initial premiums. De-

fendants were allegedly assured the initial premiums would sustain the 1988 policies due to interest accumulation and the cash values of the 1982 policies. Cash value would diminish if interest rates dropped but this was not disclosed in the policies. Bruce Booker testified that GE's calculation in determining the policies initial premiums was based on interest rates remaining the same for 20–30 years. It is preposterous to assume that interest rates would remain constant or anywhere near the same ballpark for fifty to seventy years. However, this is not made clear anywhere in the policy. Further, it is absurd to expect the Barbours to have understood the ramifications of the financial market on their insurance policy. The policy language contains no clear language indicating GE's right to charge anything beyond the initial premium. Moreover, William Barbour sold life insurance in the 1960's and even worked for GE, then Life of Virginia, in 1965 and 1966 selling a different type of policy. When asked in his deposition about his understanding of the way these policies are valued, he stated he had no idea what "cost of insurance" or "cash value" means [8]. He also stated he had no idea of how cash value builds up in a policy or how that concept affects the life of the policy. *Id.* The policies contain no explanation of the circumstances under which the initial premiums would no longer sustain the policies, of what the true meaning of cash value is in relation to the continuation of the policy or of how insureds could avoid the lapse of their policies. There are places where terms of art are defined or where a number is stated such as the then-current interest rate or the illustrative interest rates. However, these terms or phrases are not explained in relation to how they affect the policy.

The Policy Data Sheet provided for a "scheduled premium" that was due at the time the 1988 policies were issued. Although the policy is named "Flexible Premium Adjustable Life Insurance" policy, nowhere is "flexible" explained. The only place "flexible" is mentioned is where it is noted the *insured* can change the *frequency* or the *amount* of the premiums. In another section, the policy states it is possible coverage will expire "where either no premiums are paid following payment of the initial premium or subsequent premiums are insufficient to continue coverage to such date." This statement is completely inconsistent with the front page of the Policy Data Sheet indicating that only a single premium payment was due.

Another section of the policy titled "Continuation of Coverage" provides if the premiums are not made "as planned" the coverage will lapse unless "cash value less policy debt covers the monthly deduction." Again, this concept is not explained. This is a very vague, confusing statement considering these policies were sold as "single premium" policies. Over all, the entire policy is profoundly vague and confusing. Under the summary judgment standards this Court must apply, Defendants have far exceeded their burden to establish material issues of fact precluding judgment for GE.

Contrary to GE's argument, waiver and estoppel do not apply to bar Defendants' claims. Clearly the Defendants did not ratify or affirm the contract in question *with knowledge of the fraud* thereby showing their intention to abide by the contract. *Touche, Inc. v. Dearborn,* 161 Ga.App. 188, 291 S.E.2d 35, 38 (1982). Further, they did not waive the cause of action for fraud. The "question as to whether the defrauded party has waived the fraud is one mainly of intent." *Id.* The issue of intent is a question more appropriately submitted to a jury and not adjudicated on summary judgment.

---

**8.** *See* Depo. of W. Barbour at Tab 38, Ex. 7, p. 13.

Likewise, GE's argument that the Barbours should rescind the policies and return any benefit obtained therefrom is equally without merit. First, none of the Barbours have realized any tangible, monetary benefit from the policies as they are all still alive. Second, it would be extremely inequitable and unreasonable at this point to require the Barbours to rescind the policies and buy new ones. Nearly 20 years have passed since they purchased their policies. In that time, William and Sandra Barbour have aged and life insurance would be considerably more expensive for them now. Shanon and Crystal are now grown and life insurance would be somewhat more expensive for them as well. More important, it would be extremely inequitable and unreasonable at this point to require the Barbours to rescind their policies because they paid the agreed upon premium and two subsequent premiums on the four policies. They are therefore due every penny of coverage those premiums provided. Because Defendants have submitted sufficient evidence to create material issues of fact in dispute, **Summary Judgment** is **denied** as to the Fraud and Concealment claims.

## C. Georgia RICO Claims

Because the issue of whether GE committed fraud must be submitted to a jury, there is no basis upon which to decide the RICO claims. RICO claims cannot be adjudicated without a finding of fraud that could serve as a predicate act under Georgia RICO laws. *See Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.,* 117 F.Supp.2d 1357, 1362 (N.D.Ga. 2000). Accordingly, **Summary Judgment** is **DENIED** as to the RICO claims.

## VI. Conclusion

For these reasons, Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim is DENIED. Defendants' Motion for Summary Judgment is DENIED as to their claim attacking this Court's jurisdiction to consider the Declaratory Judgment action and MOOT to the extent it has already been adjudicated in the Order denying the joinder of the selling agent.